MILLER v. PERUVIAN CONSOL. MIN. CO. et al.

No. 5072.   Decided May 3, 1932.   (11 P. [2d] 291.)

■ ■ ■

■

*Allen T. Sanford* and *Chris Mathison,* both of Salt Lake City, for appellants.

*H. V. Van Pelt* and *J. Louis Brown,* both of Salt Lake City, for respondents.

PRATT, District Judge.

This is a foreclosure suit upon a note and mortgage executed by the defendant mining company. The validity of the instruments is questioned upon the following grounds: (1) Fraud and collusion of two directors (plaintiff and one J. P. Clays); (2) a lack of a quorum at board meetings creating the indebtedness and executing the instruments; and (3) a failure to have the note and mortgage confirmed by the majority of the outstanding stock of the corporation at a meeting called for that purpose. In reply the plaintiff sets up estoppel, laches, acquiescence, and ratification.

In 1914 Ernest C. Miller, plaintiff herein, obtained a five-year lease of certain mining claims of the defendant Peruvian Consolidated Mining Company together with an option to purchase 396,957 shares of stock of said company. Among the claims so leased was a one-half interest in a claim called the Fritz. The other half was owned by an estate not concerned with this litigation. Plaintiff took possession of the claims and proceeded with mining operations. Meeting with some success, and finding, as he thought, that the better ore was in the Fritz claim, he decided to obtain that outstanding one-half interest. He was unable to locate the owners until one J. P. Clays, a director of the defendant company, came to his aid. Plaintiff obtained an option upon this one-half interest for the sum of $1,500 which was eventually paid up except for a balance of $500.

References herein to the defendant company are references to the Peruvian Consolidated Mining Company. Of this company J. P. Clays was the controlling figure. His personal holdings were small in the beginning, but the estate of his father was a large holder and he managed the estate.

The other directors of the company were H. A. Welling, R. W. Katz, C. B. Clays, a brother of J. P. Clays, and one J. F. Ristine. The latter died. The articles of incorporation called for five trustees (directors).

In 1916 discussions arose between the parties concerning a surrender by plaintiff of his lease and option together with his one-half interest in the Fritz claim, to the company and a taking of company stock in lieu thereof. In August of that year, before any definite arrangements upon the proposed surrender, plaintiff organized a company of his own, its capital consisting of the lease and option in question. Plaintiff retained most of the stock but gave J. P. Clays 4,900 shares and H. A. Welling 100 shares. J. P. Clays became a director in that company. However, this company was in effect the plaintiff and our discussion of this case shall proceed upon that theory except where otherwise designated.

Eventually plaintiff indicated his willingness to surrender his lease, option, and one-half interest in the Fritz claim if the defendant company would pay him certain expenses he had advanced, pay the balance of $500 on the Fritz claim, and give him 375,000 shares of stock of the defendant company.

On October 23, 1916, at a meeting of the board of directors, C. B. Clays (not J. P. Clays) made a motion, which was carried, to call a meeting of the stockholders for the purpose of increasing the capital stock of the company to enable it to acquire plaintiff's interests. This meeting was noticed and called but was abandoned due to the fact that plaintiff and J. P. Clays had contacted Idaho capital who took an option upon plaintiff's lease, option, and Fritz one-half interest for a sum greatly in excess of the amount that plaintiff had agreed to pay the defendant for his lease and option. The Idaho option fell through.

On July 19, 1917, at a meeting of the board of directors R. W. Katz moved the calling of a stockholders' meeting to increase the capital stock for the same purpose. The meet-

ing was noticed, called and on October 8, 1917, the stock-holders met and increased their stock.

October 18, 1917, plaintiff became a stockholder in the defendant company to the extent of 2,000 shares. No one appears to know why or how. October 25, 1917, he became a director succeeding J. F. Ristine, deceased.

October 30, 1917. The meeting of the board of directors of this date is the subject of severe criticism at the hands of the defendants. The directors present were: H. A. Well-ing, stockholder in plaintiff's company and stockholder and director in defendant company; J. P. Clays, stockholder and director in both companies; and plaintiff, stockholder and director in both companies. At this meeting the surrender and considerations therefor were ratified. A resolution was passed to this effect.

The sum of $7,500 was the amount fixed to be paid plain-tiff for his advancements, but this was subsequently reduced upon his explanation that he had made a mistake in his accounts. The reduction was to $6,653.59. The $500 balance due upon the Fritz one-half interest was subsequently paid by the defendant company. In the transfer of the 375,000 shares of stock intended for plaintiff, some 150,000 were transferred to J. P. Clays at plaintiff's request.

Plaintiff was never paid his advancements. On Septem-ber 10, 1918, the board of directors authorized the execution of a note to him secured by stock to cover his indebtedness. The note matured March 15, 1919, and was not paid. Plain-tiff continued as director in the company until 1927, but the active management of the claims was given to C. B. Clays (not J. P. Clays).

Finally plaintiff became dissatisfied with his treatment and insisted upon being secured in his indebtedness.

June 30, 1921 (July 5, 1921). The board meeting on this date is also the subject of defendants' criticism. Two dates are given as there is confusion in the record in referring to the meeting. The directors present were: H. A. Welling, J. P. Clays, and plaintiff—the same who attended the meet-

ing of October 30, 1917. The note and mortgage sued upon were authorized at this meeting, as security for the indebtedness to plaintiff which by this time had increased with interest and additional advancements to the company by him. The instruments were executed and delivered. The date of their maturity was June 1, 1923. They were not paid and plaintiff gave an extension to July 1, 1927. Plaintiff never received payment and finally brought this suit to foreclose upon them. The mortgage covers the property which was the subject of the surrender. The stock given to plaintiff as security for his first note was returned by him to the company. Plaintiff was successful in the lower court, and defendants appeal.

We have set out the facts of the case generally as we believe they are shown by the weight of the evidence. The principal controversy between the parties over the incurring of the indebtedness is as to whether or not plaintiff has shown by his evidence that the transaction was entered into in good faith, and free of fraud and collusion. We believe he has. A great deal of time might be taken up in reviewing the facts and giving our reason for this belief, but as those facts are peculiar to this case it would not add any great weight to the opinion to do so. It seems sufficient to say that the apparent willingness of plaintiff to waive his rights and repeatedly extend time for payment of the indebtedness; his reluctance to enter into the surrender in the first place; the activities of C. B. Clays, a director not charged with fraud or collusion, who appeared extremely anxious to regain the properties for the defendant company; and the fact that C. B. Clays was antagonistic to his brother J. P. Clays and to plaintiff's entering into any contracts with outsiders which were not contracts with the defendant company—are all circumstances inconsistent with ulterior motives on the part of plaintiff or J. P. Clays. If plaintiff desired to acquire the properties of the defendant company, or desired to acquire money from that company by underhanded means, what was his reason for procrasti-

nating so in effort to accomplish that purpose, thereby laying himself open to most any form of attack that would interfere with his nefarious schemes?

Over a long period of time meetings were held and transactions entered into which, in some manner or another, recognized this surrender and indebtedness. Each director of the defendant company at one stage or another of these many proceedings actively participated in that recognition. Under such circumstances we hold that it would be inequitable and unjust to permit defendants to avail themselves of the defense of a lack of a quorum of directors at the meetings about which complaint is made. We believe the concern of the stockholders in the matter is disposed of by our determination of defendants' third objection to the validity of the instruments in question.

Let us now discuss that objection: Article 4 of the articles of incorporation of the Peruvian Consolidated Mining Company reads as follows:

"That the object, business and pursuit of said corporation is and shall continue to be to carry on and conduct the business of purchasing, working, developing, selling and disposing of the products of mines and mining claims and doing all such things as are customarily incident to the carrying on of a general mining business."

Defendants claim that the articles of incorporation of this company do not provide for the sale of the property of the corporation and therefore the proviso of section 869, Laws of Utah 1917, is applicable; that in applying that proviso it was the intention of the Legislature to include a mortgage in the terms "sale or other disposition." This section is found in our general incorporation laws and is entitled "Powers enumerated"; quotations from it are found hereinafter.

The decisions involving the alienation of corporate property seem to be of two classes: Those of quasi public corporations, wherein the courts have held it against public

policy to permit the corporation to alienate its property; and those of strictly private corporations, wherein the courts have adopted the theory that the purpose of such statutes is to prevent such alienation or encumbrance of the property of the corporation as would disable it from the conduct of its business. We are not concerned with the former class of cases in this case.

Defendants have cited us the case of *Baggaley* v. *Pittsburg & Lake Superior Iron Company* (C. C. A.) 90 F. 636, 637, as a good example of the method of interpreting such statutes. Although the section of the law interpreted in that case is not the same as the one before us, the principle is the same. We quote from the opinion of the learned judge in that case:

"But does the statute prohibit the sale of all lands or interests therein unless consented to by the requisite number of shareholders? or only such as are useful for mining purposes? * * * The general purpose of the statute was to protect the interests of shareholders in mining companies. * * * The purpose of this statute was to prevent such alienations or incumbrances of property as would disable the company from the conduct of its business as a mining company. To avoid all possible misinterpretations of this intent, the legislature, from an excess of caution, has seen fit to except out of the act a class of property which, by description, is not necessary or important to the integrity of the company's business. The lands of this company situated within Delta and Menominee counties are not mineral lands. They were probably bought in the belief that they contained minerals. No such minerals have been discovered. They are, therefore, lands not 'required' for mining purposes. * * * The sale of either or both would in no degree cripple or disable the company from the conduct of its business."

Principles similar to these may be found in the note 35 L. R. A. (N. S.) 396.

Now let us apply these principles to section 869 of our laws. That part of the section applying to corporations in general contains this statement:

"* * * to buy, receive, use, sell, mortgage, lease or bond, or otherwise dispose of all such real estate as may be necessary, useful, or desirable for it to own, use, or dispose of for its purposes. * * *"

And that part pertaining to mining companies contains this:

" * * * shall, in addition to the powers above enumerated, have the power to purchase, take on bond or lease, or in exchange, or locate, or otherwise acquire any lands, mines, options, territory, fields, or claims, and to sell, convey, lease, bond, mortgage, dispose of, or otherwise deal in the same to such extent as the board of directors may deem prudent, subject always to the provisions of the articles of incorporation and by-laws; provided, that in case the articles of incorporation do not provide for the sale or other disposition of the property of the corporation, then the act of the board of directors shall not be valid or binding on the corporation until confirmed by a vote of a majority in amount of the stock outstanding at a meeting of the stockholders duly called to consider such action of the board. When the articles of association provide that the property of the corporation may be sold, mortgaged, or otherwise disposed of by the directors or by the stockholders, sales made in accordance therewith shall be binding on the company. * * * "

Is the same distinction not applicable in our law? The board of directors may acquire or dispose of such properties as are necessary in the conduct of the business of the corporation to enable it to make a profit in the business for which it was intended, but (proviso) cannot, except with the consent of a certain number of the stockholders, deprive it of that property without which its purposes cannot be accomplished. The proviso in our law is merely a precautionary clause inserted by the Legislature to show that they did not mean by granting the general power to the board of directors to carry on the business of the corporation that they intended that that board should with such power deprive the corporation of its ability to function.

The defendants have taken a rather restricted view of the articles of incorportion of the Peruvian Consolidated Mining Company. They have based this view principally upon the word "products" in article 4, quoted above. Carried out literally it would mean that the real purpose of this corporation was the dealing in, say, ores. They had

a right to purchase these products (ores), and having such a right it was an immaterial matter so far as the existence of the corporation was concerned whether or not it purchased, owned, or sold mining claims or mines—it might own them and work them and get the ore that way, or it might purchase that ore from others, or it might find property it believed contained good ores and lease that property to get the ore. The ownership of mines or claims, or real estate was only incidental to its purpose under such a view. Under the interpretations above set out, the disposal of properties incident to the conduct of the business was not an act by the board of directors that had to be submitted to the stockholders.

We have spoken of defendants' view of the articles as being restricted. We do not wish to say that the interpretation is erroneous; in fact, we shall accept it as correct for the purposes of this opinion. But as we read the articles of incorporation in this case we were impressed with the fact that the company was not ■ organized merely to deal in the products of mines, but to engage in the general mining business. The introduction to the articles reads as follows: "Witnesseth: Whereas the undersigned are desirous of associating themselves for the purpose of establishing and conducting a general mining business and holding property therein and of incorporating for the purpose under and in pursuance of the laws of said territory of Utah." Again the last two lines of article 4 speak of "doing all such things as are customarily incident to the carrying on of a general mining business." In the clause of article 4 referring to products, the incorporators use the terms "working" and "developing," which ordinarily have application to the mines or claims for the purpose of getting the ores. Still further: What has been the practical application of these articles by the incorporators and their successors? Under article 6 they immediately purchase certain mines or claims; they purchase the additional one-half interest in the Fritz claim;

they lease the claims to the plaintiff in 1914; they enter into other leases of their claims. Did they not have in mind that they were dealing in mines and mining claims and not merely the products, and did they not intend by the words "purchasing, working, developing, selling and otherwise disposing of," to include mines and mining claims as well as the products? If this view were adopted, then the articles do authorize sale of the property in question and the submission to the stockholders was unnecessary under the proviso of section 869.

"To determine the actual character of a corporation regard must be had to the objects of its formation and the nature of its business as stated in the articles themselves." 7 R. C. L. 55, § 33 at end.

Another point was argued in the case with reference to the question of whether or not a mortgage is included in the terms "sale or other disposition of" as found in the proviso of section 869. As a decision of that point is not necessary to the determination of the case, we express no opinion upon it.

Other errors were assigned by the defendants but not relied upon in their arguments, and are therefore not considered by us in the case.

The judgment and decree of the lower court is affirmed. Respondent shall recover costs.

CHERRY, C. J., and ELIAS HANSEN, FOLLAND, and EPHRAIM HANSON, JJ., concur.

STRAUP, J., being disqualified did not participate herein.